Our next case is Center for Biological Diversity v. United States EPA. Numbers 21-3023 and 22-1012. And we'll hear from you counsel. Will you be reserving any time? Yes, three minutes, Your Honor. That'll be granted. You can proceed. May it please the court. My name is Alexa Carino and I represent Petitioner Center for Biological Diversity, hereinafter referred to as the Center. Respectfully, as I mentioned, I would like to reserve three minutes for rebuttal. Your Honor, to simplify these consolidated cases, these 17 facilities were unlawfully approved when EPA failed to conduct the statutorily mandated analysis under Section 110L of the Clean Air Act. Furthermore, at least four facilities permits facially increase the amount of emissions that are permitted, as compared to the presumptive RACT, contrary to EPA's assertion that its approval of the SIPs only maintained the status quo of the emissions levels. The issue obviously has come back to Chevron here. Does the 7410, I guess, 1, unambiguously instruct the EPA how to determine whether a state's proposed plan, like you have 17 facilities here, does it interfere with the attainment of air quality standards? And I don't think the statute unambiguously instructs the EPA how to proceed, does it? So, Your Honor, there are two issues within the Chevron aspect of this case. The first being the word attainment, which is what the center raised in its petition for review of these both cases below within Section 110L. But the statute doesn't tell me how to determine interference. That is correct, Your Honor. And as the EPA pointed out, proceeding under Chevron Step 2, interfere has been found as an ambiguous word by at least two other courts. However, the issue lies with the word attainment within Section 110L. And as the center pointed out, attainment is different than the word emissions. So, attainment is a benchmark that has to be met in order to comply with the National Ambient Air Quality Standards. And can we agree that it's interference with the NAQS, right? Yes, Your Honor. Okay, good. So, as to the word attainment, that is a benchmark that emissions are a part of in order to reach. As to the word interference, however, that is an ambiguous word, as I've mentioned, as two other courts have found. However, EPA's reasoning underneath the interpretation of the word interfere is unreasonable and not entitled to deference. It enacts circular reasoning in its interpretation of the word interfere, which only makes sense if you also read the statute to have replaced the word attainment with the word emissions, which, as the center argued, is contrary to the plain language of Section 110L. Does attainment mean improvement? It seems to me that that's your position in this case. So, Your Honor, attainment is a state of being for either an individual state or a region of collections of states to have a status under the Clean Air Act, to be in attainment of the National Ambient Air Quality Standards. You're either in attainment or you're not in attainment, and different obligations flow from whether a state is in attainment of those quality standards or not. Does that help clarify your question? If you may rephrase, then. Well, attainment can also mean not getting worse. That is correct, Your Honor. Attainment would be that the status of that state is not getting worse in air quality, in ambient air quality, that it's reached the goals that EPA has set in order to attain those standards. And why isn't emissions a suitable standard to look at, particularly when the model may be defective? I see, Your Honor. So emissions are not appropriate to substitute for the word attainment because attainment should be looking at a variety of other factors as well. It needs to be looking at the chemical composition of the air in that region. It needs to be looking at meteorology. It needs to be looking at topography. A whole variety of factors that EPA is obligated to look at through some sort of analysis. The Center suggests modeling. The EPA may find a different analysis is appropriate. But they have to do some sort of analysis looking at all of those factors on the whole and not just looking at the numbers of emissions that are on a piece of paper, comparing them to an older piece of paper, and saying, this seems like it's the same. Let's approve this and move forward. So they have to look at it. Let's say we agree with you that maybe they should look at other things like meteorology and the various factors that you've mentioned in your briefing in addition to emissions. But if we don't have a statute that is clear in terms of what it means to interfere with the attainment of air quality standards, it seems under Chevron it's left to the agency. And how can I then say what the agency is doing by focusing on the principal thing, which is emissions under the Clean Air Act? Why isn't that reasonable? So, Your Honor, it would be unreasonable, particularly in this situation, because the EPA's interpretation permits for absurd results. And this is very clear in the case of the Roystone Compressor Station, which the EPA has already admitted on pages 44 and 45 of its briefing that it erred in approving the permit for the Roystone Compressor Station. And that is because the Roystone Compressor Station utilizes a control technology that itself also emits air pollutants under a different air quality standard, that emission being NOx. So by failing to conduct that whole-picture analysis of what impacts there may be on the ambient air quality, EPA has erred in at least one instance that it admitted in this case. I thought what they admitted is that the thermal oxidizer at that particular facility emits nitrous oxide. Is that correct? That is correct, Your Honor. And that thermal oxidizer is a control technology that is utilized to control the VOCs, the ozone emissions, which are at issue in the rulemakings below. So by only focusing on the numbers for ozone emissions and ignoring additional factors such as the thermal oxidizer, which also emits NOx, it created this real-life problem. All right. So aside from the EPA's admission about the Roystone thermal oxidizer, have you identified any other instances in which Pennsylvania's VOC control technologies emit NOx? Do you just call it NOx? You guys know this better than me. Pollutants? Are there other instances that you can point to? Yes, Your Honor. And in fact, another instance would be the Advanced 6 Resins Frankfurt plant, which is in the second rule under these second-holidated cases. That also utilizes a thermal oxidizer. In addition to that secondary facility, there are... Is this better, by the way, that we're talking about here with respect to Roystone? Isn't there a petition for reconsideration still pending? There is a petition for reconsideration still pending, Your Honor, within the administrative agency. So what should we do in connection with that? So the Senate's position regarding the administrative petition is that it does not actually preclude this court from making a finding on the cases here today. It may not preclude us, but does it make sense for us to decide it? Maybe look at this whole thing and say, you know, you're right. We should do something different. It would make sense to create a ruling, Your Honor, because that administrative petition merely elaborates upon the issues that are already before this court. So if this court is to issue a decision on these cases, it may very well obviate the need for the agency to issue a decision on that administrative petition. Can I also ask you a question about Chevron? It figures into a lot of the cases we've all read with regard to this whole appeal. Nonetheless, it's conspicuous that your friends across the aisle, the EPA, they haven't seemed to rely on Chevron. How do we deal with that? If they're not relying on it, do any of these cases make sense for us to follow? So, Your Honor, whether or not the EPA has explicitly relied upon Chevron in its briefing or in its response to comment, it still is seeking the deference that Chevron affords agencies. And Chevron still being good law, it should inform the court in its decision-making process moving forward on these cases. And so, as I mentioned, as applied, EPA's decision-making... What work, if any, does the word interfere with have in... What work, if any, does it do in that statute? We just have a few words. It interferes with the attainment of air emissions standards. What does interfere with mean to you? So, as I mentioned, the word interfere is ambiguous, so that would be something that the court is able to interpret as decided by two other courts previously. But in the Senate's position, the word interfere means hinder with the status of attainment. And that is something that the EPA has actually brought up first before advancing its circular reasoning within its line of interpretation of what interfere actually means. So, on page 21 of EPA's brief, they first say that interfere means to hinder. And then they later elaborate as to how hinder actually means make worse and continues down this road of confusing interpretation that just gets farther and farther away from the plain meaning of the act, which ultimately has to deal with the status of states, whether they're in attainment or not, of the national ambient air quality standards. At the end of the day, there's much daylight between what you two say. You, in your opening, said baseline. So, what you're saying now is it doesn't necessarily mean get worse, but there's a certain baseline it can't go below, I guess, right? Yes, Your Honor. It has to at least be able to follow in line to that status of attainment for the ambient air quality standards. And here, there are several cases that facially make the air quality fall below that baseline in terms of the emissions that EPA approved for at least three facilities that are present within these cases. There's the Merck, Sharp, and Dome Corporation facility, which significantly increases the amount of emissions that are allowed. The Advanced 6 facility, which I've already mentioned, has that thermal oxidizer and also increases the emissions. And Newman and Company, which also facially increases the emissions that are permitted as well. So, for EPA to say that they're maintaining a status quo is simply incorrect based upon its comparison of the numbers, if that's the sort of look that it's putting upon these facilities. But instead, the Center does argue that EPA has a duty to look at the situation as a whole, evaluate these multiple factors that can impact ambient air quality, and not just rubber stamp based upon a comparison of numbers on a piece of paper. I see that I'm out of time if the Court has no further questions. Oh, just, it's your view that you did not waive the baseline argument in the proceedings before the EPA, is that it? That is correct. Thank you. Thank you. Thank you. You may proceed. Good morning, and may it please the Court. Jeffrey Hughes on behalf of EPA, and with me at Council's table are Elizabeth Pettit and Neil Vigioni from EPA. The Clean Air Act requires Pennsylvania to achieve reductions in emissions from existing sources with reasonably available control technology, or RACT. The Commonwealth made, in the State Implementation Plan revisions at issue here, source-specific determinations for 17 facilities as to what qualifies as RACT, and the Center doesn't challenge those determinations here. In reviewing these submissions, EPA followed its practice for over 15 years, and concluded that since emissions would not increase, they would not interfere with the attainment of the National Ambient Air Quality Standards, or the NAAQS. Can we talk about interfere with any applicable requirement concerning attainment? We engaged your colleague across the aisle. What does it mean? Is it more than hinder? Looking at the text and the context of the entire, and the structure of the entire statute, we think it has to mean, in the context of these RACT determinations, to make air quality worse. And that's because, if you look at the Clean Air Act, the NAAQS program includes an array of mandatory controls and consequences for failing to attain the National Ambient Air Quality Standards. And so, given the intricate and comprehensive design of the Ozone NAAQS program, it's unreasonable to think that Section 110L, which only requires non-interference with the NAAQS, to require attainment of the NAAQS. The way attainment is achieved is through this battery of mandatory controls and emission restrictions. And so, reading the text of Section 7410L, in the context of the broader Clean Air Act, we think that Section 110L is an anti-backsliding statute that precludes approval in certain circumstances of, precludes approval in certain circumstances of supervision that will relax or remove pollution or emission controls in a supervision. But isn't the argument that this is more than anti-backsliding? Let's say you start off with something that's highly polluted, and if you're going to use that as your baseline, it never goes worse than that. That doesn't help the atmosphere. Your Honor, I think the SIP revision at issue is structured, or excuse me, EPA's analysis is structured here by the SIP revision. And so, here the EPA is reviewing SIP revisions that are addressing reasonably available control technology in order to reduce emissions. And so, the emissions is reasonably the focus of that analysis. And second, I think you wouldn't say in such a circumstance that the SIP revision would hinder attainment of the NAAQS. What is the ultimate purpose, then, of this particular provision? We interpret Subsection L to preclude the relaxing of SIP revisions under certain circumstances. And so, if an area is in non-attainment for ozone, it might be subject to a variety of mandatory controls. In the event that it subsequently does attain the National Ambient Air Quality Standards by the attainment date, it might then reasonably seek to remove some of those mandatory controls. Let me see if I understand. So, the air quality standards, the goal or the threshold or the base that you need to meet is established in what way? So, under the Clean Air Act, EPA will from time to time promulgate new standards for the various criteria pollutants of which ozone and NAAQS are two of them. And so, here, for instance, we're talking about the 2008 standards. There will be what's called a design value, and this is basically the parts per million for ozone in the area. And once that's promulgated, there will be an implementation rule that was promulgated in 2012 in this case. And then the states will have a certain amount of time to comply with that standard. So, let's say, is the 2012 number for attainment less than the number that previously existed? Yes, Your Honor. The 2008 ozone NAAQS are lower than the previous 1997 ozone NAAQS. And when you set those thresholds that you need to attain, how do you go about doing it? Just by looking at admissions, or are there other things that you look at? I'm sorry, when you... When you set the standard between 2008 and 2012, and so you're in 2012 and you're now setting it at a lower standard, what are the factors that go into setting that revised standard? I understand. So, just to be clear, there were the 2008 ozone NAAQS, and then there was an implementation rule for how states could comply with the 2008 ozone NAAQS in 2012. The 2008 are more stringent than the 1997 ozone NAAQS. For the primary standards for the NAAQS, the question is an adequate margin to protect the public health. And so that is how EPA determines what the appropriate standard is. And then once the standard is set, the states will have a certain amount of time to comply. They'll be categorized as whether they've attained the NAAQS and they're... But it's a dumb question. The 1997 standard probably was what you were hoping to get in order to help public health. The 2008 standard would be the same. The 2012 revised standard would be the same. What do you look at in order to say, okay, we've made perhaps some progress, but we want to make the public health attainment even better than it was 11 years before or four years before? Right. So two separate points here, Your Honor. First is in determining what the primary NAAQS are or NAAQS is, the question is, is it adequately protecting public health? And so that's how the standard itself is determined. In terms of how a region then attains the NAAQS or complies with the NAAQS, the areas will be categorized to be in attainment they've complied with the standard or they're in non-attainment and they haven't complied with the standard. That's why you're getting my dumb question. Isn't the public health the same in 97 as in 08 as in 12? I see. EPA will look at newest scientific research to determine what an appropriate standard is, and so it will undertake this review to determine what is an appropriate level of, for example, ozone in the ambient air. It seems that the lodestar here is sort of ambient air quality. Your adversary makes a fairly simple argument. Shouldn't there be some analysis of ambient air quality beyond just emissions? And how do you respond to that? So I think there are two principal responses, Your Honor. First is that these are supervisions that are addressing emissions control technology, and it's emissions control technology for already existing sources. These aren't, this isn't the impact of new sources. This isn't, and so it's, and so these have already been in operation for some time in some cases. And so that is going to frame the analysis. And then additionally, the question is, given subsection L's role in the Clean Air Act, emissions, if emissions aren't increasing, or if they're staying constant, or in this case decreasing several, there's new control technology applied in some cases, there's some sources have gone offline, the ambient air quality, the air quality won't be getting worse. There are multiple factors, certainly, but the topography hasn't changed since the RACT-1 rule was implemented. And so I think given both the structure of the supervisions, and then just the structure of the act makes sense. And to be clear, RACT is not the only mechanism by which the states, by which the Clean Air Act requires the states to attain the standards. There are multiple other provisions that apply if an area is a non-attainment, or in the case of Pennsylvania, which is in the ozone transport region, to the entire state, whether it's an attainment or not. And I just want to follow up on what I talked to your friend across the aisle on. You know, I have to say, this is one of the first environmental briefs I've ever seen that doesn't cite Chevron. Is that intentional? Should we not be relying upon Chevron anymore? We did not invoke Chevron in this case, Your Honor. In the rules at issue, the agency didn't identify, explicitly identify an ambiguous term and interpret it. And we think we have the best reading of the statute, so it wasn't necessary to the extent that... Yet you say we should defer to the agency, right? We think you should defer to the agency's technical judgment with respect to whether emissions is a reasonable proxy and a reasonable way to implement the subsection L analysis. So you're saying the statute is not ambiguous? We believe the best reading of the statute is the one that EPA puts forward. But wouldn't the fallback be, but court, if you do think it is ambiguous, we still win under Chevron? We didn't make that argument, Your Honor, but if the court does find it ambiguous, clearly it's been, it's in the case that it's been invoked by a petitioner. So you could, and the arguments that we would make at Chevron Step 2 are the same as the arguments we made at the, you know, de novo review of the statute. If we agree with the center's interpretation of subsection L, would we be creating a circuit split on that issue? I think that it would be contrary, certainly, to the Ninth Circuit's decision in Wild Earth Guardians. In that case, the, there was a challenge to a regional Hays SIP revision. And the court there held that there could be no interference if there's no increase in emissions and no relaxing of any emission limitations or controls. Good. Could you address the issue with respect to the Royal Stone Compressor Station? Yes, Your Honor. So the Royal Stone Compressor Station, what the rule said is that the approval of the SIP revision with respect to the Royal Stone Compressor Station did not involve any new NOx emissions. We concede that that is correct, but we think that the center has certainly forfeit that argument. The idea that a single reference to a different piece of control technology in an appendix to a comment could put EPA on notice that a different piece of control technology at one facility might increase emissions when the center's comment explicitly states that NOx emissions will be kept equal or reduced. We think cannot possibly put EPA on notice. And the case that the center cites for that, the NRDC, the EPA case, their citation is to an opinion dissenting from the D.C. Circuit's conclusion of forfeiture. So we think that's certainly forfeit. But if the court were to decide to reach it, we would ask for a remand. We think that that argument only applies to the Royal Stone Compressor Station. I heard a reference to the Advanced 6 thermal oxidizer, but in the record, this is a JA-92, that is an existing control already. So this is not a new piece of technology that would increase NOx emissions. How about the motion for reconsideration or petition for reconsideration? How does that affect us? Well, Your Honor, we think that the argument is forfeit and that in this proceeding, it's been raised separately in a petition for reconsideration and EPA is considering it. And if it's granted and it's reconsidered, then we think that the center will have the relief that it seeks. If it's denied, then it can be challenged at that time. But we think it's a severable argument with respect to, again, a single piece of control technology at a single source at a single facility. And it's a different argument, frankly, than the one they're making in the main, which is that... Could we put this on our CAV list or stay it basically until that happens? I don't think that's necessary, Your Honor. It's going to be a slightly different... It's going to be a different argument with potentially different contours. For instance, was this something that could have been raised during the rulemaking, during the comment period itself? So it's going to be a different issue. It's going to be a small issue. Do we have any idea about the timing on that other petition? I don't have any information on the timing at this point, Your Honor. All right. Okay. Just a final question. Is it per se lawful for the EPA to focus on emissions only? We think so, Your Honor, because this is an emissions-focused SIP provision. And we think that given the structure of the Act, this provision has to be read as an anti-backsliding provision. And the only way for this revision to negatively impact ambient air quality... Maybe put it another way. Or was it lawful here only because no other factor had changed? I don't... I don't think so, Your Honor. I think that the question is, has any restriction or control technology been relaxed or removed such that there would be increasing emissions? As I mentioned before, the Clean Air Act has a range of mandatory controls in the event that in order to help a region get to attainment, and in the event that it doesn't, it's subject to yet more additional mandatory controls. And so we don't think this can be read as a capacious Attainment Act standards requiring a full dress analysis. I think, you know, one of the provisions we said into our brief is the provision requiring an attainment demonstration for certain levels of non-attainment. And we think that the Center is close to requesting something very similar here. And we think that's not a proper reading of the statute. Final question. What would you have done if the Center's public comments demonstrated that some other factor beside emissions had changed? I think we would have to take that into consideration, Your Honor. But I think it would depend on the particular type of factor or, you know, what in particular it was suggesting had changed. Thank you, Counsel. We'll hear from Mr. Walker now. You have, what, two minutes? Two minutes. Even the Gettysburg Address was two minutes and 30 seconds. Yes. Good morning. May it please the Court. My name is Jesse Walker, and I'm an attorney for the Commonwealth of Pennsylvania representing Intervenors Pennsylvania DEP in the City of Philadelphia. I'd like to make two brief points for the Court today in my two minutes regarding the Center's failure to meet its burden of proof. The first point is that the Center misinterprets Pennsylvania's RAC 2 rule. And the second point is the Center disregards the administrative record with respect to the NFG compressor station. My first point is Pennsylvania's RAC 2 rule contains three compliance choices for the sources, subject sources. In the full plain language of the regulations at issue, when interpreted together in each provision given effect, does not automatically subject sources choosing case-by-case RAC compliance to presumptive RACs as the Center alleges. The Center wishes this automatic default theory existed under the law but is not in Pennsylvania's RAC 2 rule. This imaginary default theory was never intended by Pennsylvania in promulgating the rulemaking and would be inconsistent with EPA's longstanding definition of RAC. My second point is that the administrative record refutes the Center's backsliding argument with respect to the NFG compressor station thermal oxidizer pollution control device. The administrative record shows that the thermal oxidizer does not interfere with NAC's attainment. DEP's engineering review memo is found in the joint appendices at 232 through 239 of the record that demonstrates this analysis. Finally, Pennsylvania's construction permit for the thermal oxidizer pollution control device at the NFG facility contains a permit condition which is identical to the presumptive RAC category in 12997C for the thermal oxidizer. In closing, EPA's forfeiture arguments are dispositive and the Center has not met its burden. For the reasons discussed today, including those in the respondent and intervener briefs, interveners request that this court deny the Center's petition and uphold EPA's approval. Thank you. Thank you, counsel. Okay, we'll hear from Appellant's counsel on her rebuttal. One of the things might you address in your rebuttal, and I realize we didn't ask you about this in the opening. You made an argument that the case-by-case determinations somehow relax requirements for RAC for the emissions. How so? Your Honor, as to the three facilities that I mentioned previously which increase emissions, if you will look to Petitioner's opening brief, pages 49 to 51, we do present three charts for Your Honors to look and see quite easily the amount of increase between the presumptive limit under the 2019 RAC rule versus the variance which has been granted in these consolidated cases. So just for example, to go over this briefly with Your Honors, for Newman & Company on page 51, the prior limit was 0.1 pounds of NOx per million and 0.2 pounds of NOx, NOx per million, and the first boiler one has been increased to 0.37 pounds of NOx per million, NOx per million, and the other boiler has been increased to 0.43 pounds of NOx per million. But they were granted variances, were they not? So it's the Senate's position that these variances were unlawfully granted due to the lack of analysis under Section 110L. And I do want to clarify for the Court that the Pennsylvania SIP, which the State referred to, is not a menu of three options for source operators to pick from, rather a sequential flow of consequences for failing to submit approvals by the January 1, 2017 timeline. And so all of these facilities were submitted well after January 1, 2017, and thus they have to go under a Section 110L analysis under the presumptive RAC limitations, which were the baseline that I had mentioned previously and that Your Honors had referred to. I also want to clarify for the Court the issue of Wild Earth Guardians case. In that case, the Courts did not actually get to analyzing the text of the Clean Air Act, and the EPA in that case, in its own briefing for that case on that briefs page 55 and 57, they stated status quo air quality, not status quo emissions. And so here in this case, they're attempting to further stretch the connotation of what status quo means from actual air quality as a whole to this narrow aspect of emissions. And furthermore, I do want to address the issue of exhaustion. The Center's issues are fit for judicial review. They have fulfilled the McCart factors. They do not interfere with the agency's decision-making process, and they have put the agency on notice. The agency and its proposed rulemakings have a very limited reference to the type of analysis that it would even consider under Section 110L, which was essentially nothing. And so based upon that limited mention of what the agency was going to analyze in the proposed rulemakings, the Center had to predict what could possibly be going wrong with these proposed rules. And so they stated, and you'll see this on appendix pages 551 to 553, therefore the EPA must undertake a modeling analysis of at least the following facilities, and then provided a list. It's not the Center's job to have as detailed of a public comment as it would submit in an opening brief. And yes, NRDC versus EPA. I mean, it's a practicality, right? You don't have unlimited resources either. That's correct. And, Your Honor, similarly, the public, the Center is a nonprofit organization representing members of the public. The public simply does not have the resources or the technical expertise that the EPA does in executing a modeling analysis, which the EPA in its own regulations under the Clean Air Act lists as an option for them to perform to comply with Section 110L of the Clean Air Act. And they don't just mention topography. They mention meteorology, other chemical makeup within the ambient air quality, and other factors which the EPA would be best positioned to evaluate as the expert agency. Here they simply did not. And if Your Honors have no further questions. Thank you. Thank you, Counsel. We'll take this case under advisement. We want to thank Counsel for their excellent arguments and briefing on this really interesting case. And we'll take a short recess to meet you at sidebar if you're amenable to.